Alvin R. YAPALATER, M.D., F.A.P.A., Plaintiff,

v.

Charles W. BATES, Individually and as Westchester County Commissioner of Social Services; Barbara Blum, Individually and as New York State Commissioner of the Department of Social Services; William Steibel, Individually and as Deputy Commissioner of the New York State Department of Social Services (Division of Medical Assistance); Robert P. Whalen, Individually and as Commissioner of the New York State Department of Health; Albert DeMartino, Individually and as Director of the White Plains Regional Office of the New York State Department of Health; Lois Eil, Individually and as Medical Director, Westchester County Division of Medical Assistance of the New York State Department of Health; Henry J. Lefkowits, M.D., Individually and as Westchester County, Department of Social Services, Psychiatric Consultant, Defendants.

No. 80 Civ. 1794–CSH.

United States District Court, S. D. New York.

July 30, 1980.

</div>

Marc E. Grossman, White Plains, N. Y., for plaintiff; Evelyn K. Isaac, Fahey & Isaac, White Plains, N. Y., of counsel.

Samuel S. Yasgur, Westchester County Atty., White Plains, N. Y., for Westchester County defendants; Eric D. Koster, Sr. Asst. County Atty., White Plains, N. Y. of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for State defendants; Ellen J. Bronzo, Asst. Atty. Gen., New Hyde Park, N. Y., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Alvin R. Yapalater, M.D., is a psychiatrist practicing in White Plains, Westchester County, New York. He is a provider of services under New York State's Medicaid Plan, which is funded in part by the federal government pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*

Defendants Charles W. Bates, Albert De-Martino, Lois Eil, and Henry J. Lefkowits, M.D. (the "County defendants") are concerned with the administration of the Medicaid program on the Westchester County level. Defendants Barbara Blum, William Steibel, and Robert P. Whalen (the "State defendants") are charged with administration of the Medicaid program on the State level. Plaintiff's claims for Medicaid reimbursement are submitted in the first instance to the County defendants, who make an initial evaluation, and determine whether or not to pay them, thereafter making claims for partial reimbursement from the State, which in turn makes a claim for partial reimbursement from the federal government. In their evaluation of Medicaid-reimbursement claims, the County defendants are guided by regulations and policy decisions emanating from the State defendants.

Plaintiff has been practicing psychiatry in White Plains for a number of years. Medicaid patients have formed a significant part of his practice. At present, about 75% of his 300 patients are Medicaid recipients.[1] In his practice Dr. Yapalater employs psychologists, psychiatric social workers, psychiatric nurses, and behavioral therapists. These individuals work with patients, under plaintiff's supervision. The State defendants have refused to approve reimbursement of Dr. Yapalater for the services of these individuals. The County defendants have consequently declined to process plaintiff's reimbursement claims.

1. Considerable reference was made at trial to Psychiatric Services Center, Inc., a not-for-profit corporation Dr. Yapalater has used in the past as a vehicle for rendition of his services. The legal status of that corporation is now engaging the attention of the state courts. None of the issues is pertinent to the case at bar.

Plaintiff claims that this refusal violates Title XIX and federal regulations promulgated thereunder. He also asserts constitutional deprivations of due process and equal protection. Dr. Yapalater sues for declaratory and injunctive relief, punitive damages, and costs including attorney's fees. Jurisdiction was originally asserted under 28 U.S.C. § 1331(a),[2] it being alleged that the matter in controversy exceeds the sum of $10,000. Following filing of the first amended complaint, the Supreme Court decided *Maine v. Thiboutot,* —— U.S. ——, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The plaintiff thereupon moved to amend his complaint further, so as to state a cause of action under 42 U.S.C. § 1983,[3] and to claim attorney's fees under § 1988. That application was granted, and the complaint deemed amended accordingly.

The action first came before the Court on plaintiff's motion for preliminary injunction pursuant to Rule 65, F.R.Civ.P., and defendants' cross-motion under Rule 12(b) to dismiss the complaint for legal insufficiency. The Court directed that the trial of the action be advanced and consolidated with the hearing of the application for preliminary injunction. Rule 65(a)(2). The parties having offered the testimony of witnesses and documentary exhibits, briefs having been submitted and oral argument heard, the case is now ready for final adjudication. The following constitute the Court's Findings of Fact and Conclusions of Law. Rule 52(a), F.R.Civ.P.

**I.**

At the threshold defendants challenge the Court's subject matter jurisdiction.

In *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), the Supreme Court held that 28 U.S.C. § 1343(3) and (4)[4] did not encompass, within its jurisdictional grant, claims by welfare recipients that a state welfare regulation was invalid because it conflicted with the Social Security Act. Section 1343 did not confer federal jurisdiction over claims based on the Social Security Act, the Court held, because the Act did not secure "equal rights," the predicate to jurisdiction under § 1343(3), or "civil rights," the jurisdictional predicate under § 1343(4). Since the recipients' claims did not exceed $10,000, general federal-question jurisdiction was not available under § 1331(a). Even assuming there was a viable claim under the Civil Rights Act, 42 U.S.C. § 1983, the Court concluded that statute did not secure "equal rights" or "civil rights" within the meaning of § 1343, and afforded no independent basis for jurisdiction, since in the words of the Third Circuit's opinion, affirmed in *Chapman,* § 1983 "is not a jurisdictional statute; it only fashions a remedy." 441 U.S. at 606, 99 S.Ct. at 1910.

*Maine v. Thiboutot, supra,* answering the question assumed in *Chapman,* held that 42 U.S.C. § 1983 encompassed welfare recipi-

**2.** Section 1331(a) provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

**3.** Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**4.** Section 1343 provides in pertinent part:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . .
"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

ents' claims based upon a state's purely statutory violations of the Social Security Act, thereby making available the right to claim attorney's fees under § 1988. The case commenced in the state court, and so no federal jurisdictional question arose; but the Court, in dictum, reconciled its decision with *Chapman* by recognizing that § 1983 was broader than its so-called jurisdictional counterpart in § 1343. —— U.S. at —— n.6, 100 S.Ct. at 2506 n.6. The gap in jurisdictional coverage could, as in *Thiboutot*, be filled by a state court's general subject matter jurisdiction, or, as recognized in *Chapman*, by general federal-question jurisdiction under § 1331, and presumably by the grant of diversity jurisdiction under 28 U.S.C. § 1332.

Defendants argue, within the context of what is said to be a jurisdictional defense, that *Thiboutot*, which involved welfare *recipients*, did not overrule *sub silentio Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); and that under the *Cort* analysis,[5] plaintiff ·as a welfare *provider* has no federal right of action for an alleged violation of the Social Security Act under color of state law.

█ Defendants' *Cort v. Ash* argument, even if sound, does not defeat the Court's jurisdiction. Rather, the argument goes to the merits, and is addressed *infra*. Jurisdiction of the plaintiff's § 1983 claim for violations of the Social Security Act is properly founded upon 28 U.S.C. § 1331(a), as "arising under the Constitution, laws, or treaties

of the United States." The district court in *Cort* held that it had jurisdiction under § 1331, *Ash v. Cort*, 350 F.Supp. 227, 232 (E.D.Pa.1972), a conclusion which the Supreme Court did not question, although holding that the underlying federal statute did not create a private cause of action.

To be sure, § 1331(a) requires a $10,000 jurisdictional amount. The present defendants contend that the $10,000 jurisdictional amount is not satisfied.

█ Where the question is raised at the pleading stage, a complaint alleging the jurisdictional amount will stand unless "upon the face of the complaint, it is obvious that the suit cannot involve the necessary amount," *Saint Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 292, 58 S.Ct. 586, 591–92, 82 L.Ed. 845 (1937). The affidavits accompanying the complaint and motion for preliminary injunction alleged that plaintiff was owed $20,375 as the result of defendants' allegedly wrongful interpretation of the Medicaid regulations. While defendants argue that a number of these claims have been held up because of facial or other irregularities not related to the regulations at issue in the case, it is not necessary to inquire further into the details of these invoices, in order to determine the existence *vel non* of the jurisdictional amount. First, even if we were concerned solely with plaintiff's claim for invoices previously rendered, one cannot say from the face of his complaint that the jurisdictional amount *could not* be met; and it is well

---

5. That analysis is:

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39 [, 36 S.Ct. 482, 484, 60 L.Ed. 874] (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, e. g., *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 460 [, 94 S.Ct. 690, 693, 38 L.Ed.2d 646] (1974) (*Amtrak*). Third, it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, e. g., *Amtrak*, supra; *Securities Investor Protection Corp. v. Barbour*, 421

U.S. 412, 423 [, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey*, 379 U.S. 134 [, 85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler*, 373 U.S. 647, 652 [, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605] (1963); cf. *J. I. Case Co. v. Borak*, 377 U.S. 426, 434 [, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423] (1964); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 394–395 [, 91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 619] (1971); id., at 400 [, 91 S.Ct., at 2006] (Harlan, J., concurring in judgment)." 422 U.S. at 78, 95 S.Ct. at 2088.

settled that a federal court does not lose jurisdiction over a case originally well-founded, simply because the amount ultimately recovered falls short of $10,000. *Rosado v. Wyman*, 397 U.S. 397, 405 n.6, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970). A leading commentator has stated: ". . . the jurisdictional amount test is not dependent upon the amount actually recovered by plaintiff. Otherwise, the court's jurisdiction would be uncertain and some adjudications of the merits would be subject to a condition subsequent." 14 Wright-Miller-Cooper, *Federal Practice and Procedure* (1976) at § 3702, p. 381.

Secondly, the present complaint also contains a prayer for injunctive relief, "ordering defendants to conform their policy and procedure for outpatient services to federal law. . . ." Thus the object of the suit is to enjoin the enforcement of the state regulations and policy declarations. It is "the value of this object thus sought to be gained that determines the amount in dispute." *Packard v. Banton*, 264 U.S. 140, 142, 44 S.Ct. 257, 258, 68 L.Ed. 596 (1924). Plaintiff presently treats about 300 patients, of which 75% are Medicaid recipients, and employs a number of ancillary personnel in furtherance of their treatment, for whose services defendants refuse reimbursement. These are circumstances from which it sufficiently appears that the value of plaintiff's right to conduct his practice free of the reimbursement limitations presently imposed by the state exceeds the jurisdictional amount. *Packard v. Banton, supra*, at 143, 44 S.Ct. at 258; *Allway Taxi, Inc. v. The City of New York*, 340 F.Supp. 1120, 1126 (S.D.N.Y.1972).

Accordingly, I conclude that jurisdiction over plaintiff's claims for federal statutory violations may be had under § 1331(a).

As an alternative basis of jurisdiction, plaintiff asserts a constitutional claim under the Equal Protection Clause. That claim arises from the undisputed fact that the state reimburses under Medicaid the services of ancillary personnel rendered under a physician's supervision in psychiatric clinics, while refusing to reimburse comparable services supervised by a physician in private practice such as plaintiff. Defendants dispute the *merits* of the equal protection claim. But the claim supports *jurisdiction* under 28 U.S.C. § 1343(3) unless it is "either frivolous or so insubstantial as to be beyond the jurisdiction of the District Court." *Hagans v. Levine*, 415 U.S. 528, 539, 94 S.Ct. 1372, 1380, 39 L.Ed.2d 577 (1974); and see cases cited at 542–543, 94 S.Ct. at 1382. Plaintiff's equal protection claim cannot be so characterized. I am cited to no case which clearly forecloses it. The state's conceded granting of Medicaid reimbursement for services rendered by ancillary personnel in clinics, and denial of reimbursement for the same services in a private practice setting, require equal protection analysis. It follows that § 1343(3) gives this Court jurisdiction over plaintiff's equal protection claim, no jurisdictional amount being required, and over the statutory claim on principles of pendent jurisdiction, *Hagans* at 536, 94 S.Ct. at 1378, the jurisdictional amount in those circumstances no longer being applicable.[6]

Defendants' jurisdictional challenge is rejected.

## II.

### *Plaintiff's Statutory Claim*

Plaintiff claims that the defendants' refusal to reimburse him for services rendered by his ancillary personnel violates pertinent federal regulations. In a series of letters directed to the state agencies by the regional office of the United States Department of Health, Education and Welfare (now the Department of Health and Human Services, and referred to hereinafter as "HHS"), the federal agency has articulated an interpretation of its regulations consistent with plaintiff's claim, which would mandate Medicaid reimbursement for the services of plaintiff's ancillary personnel. Those letters were prompted by inquiries concerning other physicians, but plaintiff

---

**6.** *Holley v. Lavine*, 605 F.2d 638, 647 (2d Cir. 1979).

summons them to his aid. The regional office has also written to the Court in response to my inquiry concerning this litigation.[7]

The State defendants have adopted, and urge in this litigation, an interpretation of the pertinent federal regulations which permits the state to deny plaintiff Medicaid reimbursement for his ancillary personnel. The State defendants do not, as I understand them, deny that their regulations and practices must conform to federal regulations. The issue is whether or not the state regulations and practices are consistent with federal regulations.

As noted *ante,* the State defendants first contend that plaintiff, a provider of Medicaid services rather than a recipient, has no private federal cause of action under the Social Security Act and regulations. Defendants framed their initial attack on the complaint before the Supreme Court decided *Maine v. Thiboutot, supra.* They relied upon *Chapman, supra,* for the proposition that an alleged conflict between federal and state regulations did not give rise to a constitutional claim under 28 U.S.C. § 1343(3); and that plaintiff could not prevail under § 1331(a) because no cause of action on behalf of a provider could be implied from the Social Security Act, relying upon *Cort v. Ash, supra,* and its progeny.

During the pendency of this trial, the Supreme Court decided *Maine v. Thiboutot, supra.* We must conjure with its effect upon the case at bar. *Thiboutot* involved claims by welfare recipients that state action violated the Social Security Act. The Court held that 42 U.S.C. § 1983 fashioned a *remedy* for such claims; and that 28 U.S.C. § 1331(a) conferred *jurisdiction* if the $10,-000 amount was present.[8] Applicability of the § 1983 remedy to a claim of state Medicaid inconsistency with the Social Security Act is recognized by the *Thiboutot* majority's reference to *Blue v. Craig,* 505 F.2d 830 (4th Cir. 1974) (claim by recipients that North Carolina's Medicaid plan was inconsistent with the Social Security Act), —— U.S. at ——, 100 S.Ct. at 2507, and by Mr. Justice Powell's observation in dissent that among other areas, "Medicaid . . . may provide particularly inviting subjects of litigation." *Id.* at ——, 100 S.Ct. at 2514.

Defendants say *Thiboutot* avails plaintiff nothing because he is a welfare provider, not a recipient, and that the *Cort v. Ash* analysis, not overruled by *Thiboutot,* precludes a private right of action. Defendants stress the first *Cort* element, that the plaintiff be "one of the class for whose *especial* benefit the statute was enacted" (emphasis added), and make the point that the Social Security Act was specially intended to benefit needy recipients, not practicing physicians or other providers of welfare services.

I agree with defendants that *Thiboutot* does not overrule *Cort*; but I conclude that the *Thiboutot* rationale necessarily limits the applicability of the *Cort* analysis, where deprivation results from state action conflicting with federal statutory law. Mr. Justice Powell, dissenting in *Thiboutot,* described its impact on litigation:

> "In practical effect, today's decision means that state and local governments, officers, and employees may now face liability whenever a person believes he has been injured by the administration of *any* federal-state cooperative program, whether or not that program is related to equal or civil rights." —— U.S. at ——, 100 S.Ct. at 2513 (emphasis in original).

In a footnote appended to this language, Mr. Justice Powell continues:

> construed in *Chapman v. Houston Welfare Rights Organization, supra.* It would only mean that there are statutory rights which Congress has decided cannot be enforced in the federal courts unless 28 U.S.C. § 1331(a)'s $10,000 jurisdictional amount is satisfied." —— U.S. at —— n.6, 100 S.Ct. at 2506 n.6.

---

**7.** See letter directed to the Court under date of July 8, 1980 by Annette Blum, Assistant Regional Attorney, and attached correspondence, collectively marked Court Ex. 2 at trial.

**8.** The *Thiboutot* Court dealt with the jurisdictional amount in a footnote:

> "There is no inherent illogic in construing § 1983 more broadly than § 1343(3) was

"The only exception will be in cases where the governing statute provides an exclusive remedy for violations of its terms." *Ibid.*

 That summary of *Thiboutot's* effect appears entirely accurate. On what basis, then, is plaintiff to be denied a § 1983 remedy? If plaintiff is correct in his interpretation of governing regulations, the state has deprived him of Medicaid reimbursement to which he is legally entitled. He has, therefore, "been injured by the administration" of a federal-state cooperative program. The State defendants' contention concedes plaintiff's injury and, *arguendo*, their own maladministration, but would rebuff plaintiff without remedy because he is a mere "provider." I perceive nothing in § 1983 or the Court's rationale in *Thiboutot* which would permit, let alone require, such a limitation. Furthermore, within the § 1983 context, it distorts reality to characterize plaintiff as nothing but a "provider." To be sure, it was as a "provider" that plaintiff furnished Medicaid services; but the case at bar turns upon the legal measure of his reimbursement. Thus he may be just as accurately described as a "recipient of reimbursement." He claims that wrongful administration of the Medicaid program by the state deprives him of reimbursement to which federal law entitles him. In my judgment, § 1983 as interpreted by the *Thiboutot* majority furnishes this plaintiff a remedy.

Had Mr. Justice Powell's analysis constituted the majority opinion in *Thiboutot*, then the existence *vel non* of a private cause of action on plaintiff's behalf may well have turned upon the analysis in *Cort v. Ash* and its progeny: a more doubtful proposition from plaintiff's point of view. However, the precise effect of *Thiboutot* is to create a remedy where (as the present plaintiff clearly alleges) injury flows from a state's violation of governing federal law in a joint federal-state cooperative program. If those elements are present, *§ 1983* provides the private remedy; and there is simply no occasion to inquire whether the underlying statute also provides one, by express terms or implication. The only pertinent inquiry, as Mr. Justice Powell pointed out in his footnote, is whether the governing statute "provides an *exclusive* remedy for violations of its terms" (emphasis added). No such provision appears in the Social Security Act.

I conclude, therefore, that plaintiff is entitled to assert his claim under § 1983. I have previously held that the jurisdictional amount under 28 U.S.C. § 1331(a) is satisfied.

I now consider the pertinent statute and regulations, together with the differing interpretations put forward by federal and state agencies. Since, as we shall see, the decisive regulation was promulgated by the federal agency, pursuant to authority derived from the Social Security Act, I must consider the Court's proper role. "In construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977), quoting from *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). But the degree of deference may vary with circumstances. In *Kurcsics v. Merchants Mutual Ins. Co.*, 49 N.Y.2d 451, 459, 426 N.Y.S.2d 454, 458, 403 N.E.2d 159, 163 (1980), the New York Court of Appeals stated:

"Where the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute. If its interpretation is not irrational or unreasonable, it will be upheld. (*Matter of Howard v. Wyman*, 28 N.Y.2d 434, 322 N.Y.S.2d 683, 271 N.E.2d 528; cf. *Ostrer v. Schenck*, 41 N.Y.2d 782, 786, 396 N.Y.S.2d 335, 337, 364 N.E.2d 1107, 1109.) Where, however, the question is one of pure statutory reading and

analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretative regulations are therefore to be accorded much less weight. And, of course, if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight. (See *Matter of Adams* [*Government Employees Ins. Co.*], 52 A.D.2d 118, 121, 383 N.Y.S.2d 319, 321.)"

While the cited decisions are from New York courts, they are consistent with federal authority.

### (a) Federal Interpretation

■ HHS begins its analysis with the Medicaid provisions of the Social Security Act, 42 U.S.C. § 1396 *et seq.* A state which participates in the Medicaid program must include coverage of physicians' services in its state plan, and provide reimbursement for such services. That follows from 42 U.S.C. § 1396a(a), which provides:

"A State plan for medical assistance must—

"(13) provide—

"(B) in the case of individuals receiving aid or assistance under any plan of the State approved under subchapter I, X, XIV, or XVI, or part A of subchapter IV of this chapter, or with respect to whom supplemental security income benefits are being paid under subchapter XVI of this chapter, for the inclusion of at least the care and services listed in clauses (1) through (5) of section 1396d(a) of this title . . . ."

The categories of care and services listed in clauses (1) through (5) of 42 U.S.C. § 1396d(a) include, in clause (5):

"physicians' services furnished by a physician (as defined in section 1395x(r)(1) of this title), whether furnished in the office, the patient's home, a hospital, or a skilled nursing facility, or elsewhere; . . . ."

The definition contained of a "physician" in 42 U.S.C. § 1395x(r)(1), the Medicare provi-

sions of the Social Security Act thus incorporated by reference in Medicaid, provides in pertinent part as follows:

"The term 'physician', when used in connection with the performance of any function or action, means (1) a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such function or action . . . ."

HHS has promulgated regulations pursuant to statutory authority.[9] Central to the present case is the regulation appearing at 42 C.F.R. § 440.50, which HHS states in its letter to the Court was promulgated by the Secretary "to define physicians' services." That section of the regulations reads in its entirety:

" 'Physicians' [sic] services,' whether furnished in the office, the recipient's home, a hospital, a skilled nursing facility, or elsewhere, means services provided—

"(a) Within the scope of practice of medicine or osteopathy as defined by State law; and

"(b) By or under the personal supervision of an individual licensed under State law to practice medicine or osteopathy."

In prior correspondence with the State defendants, members of HHS's regional staff have taken the position that § 440.50 mandates reimbursement of ancillary personnel who render psychiatric services under the supervision of a physician. For example, on October 5, 1978 the regional attorney of HHS wrote to defendant Steibel. "It has come to our attention," HHS begins, "that Westchester County is refusing to provide reimbursement to physicians for care rendered by social workers under their direct personal supervision." HHS quotes the County's expressed view that social workers may not be reimbursed directly, and that "the fact that they may be providing services under the supervision of a private psychiatrist or psychologist does not enable that psychiatrist or psychologist to bill under his name for service they provide." The HHS letter of October 5,

---

**9.** 42 U.S.C. § 1302.

1978 agrees that social workers "cannot be directly reimbursed as individual providers under the New York State Medicaid plan," but goes on to say that "the quoted statement concerning reimbursement to a private physician for care rendered by social workers under his supervision is incorrect." The HHS letter then quotes § 440.50(b), and continues: "Accordingly, you must reimburse for physician's services that are rendered under a licensed physician's supervision. Private physicians, therefore, may, indeed, be reimbursed under Medicaid for care rendered under their personal supervision even if the care is rendered by a social worker." The HHS letter refers to a report that reimbursement was being denied a psychiatrist "who personally supervised social workers in treating psychiatric patients." The letter continues: "Denial of reimbursement in that case is a violation of your state plan and Federal Medicaid requirements."

In a letter dated February 7, 1979 addressed by Arthur J. O'Leary, Regional Medicaid Director, to defendant Blum, HHS expanded its interpretation of § 440.50 beyond social workers. That letter offers the following discussion:

" 'Physicians' services' are defined in 42 CFR 440.50 as services provided 'within the scope of practice of medicine or osteopathy as defined by State law; *by or under the personal supervision* of an individual licensed under State law to practice medicine or osteopathy.' As we stated previously this regulation makes FFP available not only for services provided by a physician licensed and practicing according to State law, but also makes FFP available to the physician for services of professionals and paraprofessionals employed by him and functioning under his supervision. In the latter instance the physician professionally accepts responsibility for the work of the nurse, social worker or other individual under his supervision. Both counsel here in our Regional Office as well as our

central office staff have concurred that the services of the employed professional or paraprofessional fall within the category of 'physicians' services' and are reimbursable as such." (emphasis in original).[10]

That employees other than social workers were contemplated appears clearly from the second page of O'Leary's letter, which suggests to the state "another more appropriate billing code available for use by psychiatrists submitting claims for patient treatment or counseling provided by social workers, or psychologists or other counselors under their supervision." Thus O'Leary suggested that defendant Blum consider establishing a separate billing code for use by private psychiatrists, when billing for therapy "provided as individual or group counseling by social workers, psychologists, or other therapists."

These letters were written by HHS to the State defendants entirely without regard to the present plaintiff's claim, but plaintiff obtained copies and summons them to his aid. As noted *ante*, the Court asked HHS to comment with respect to this litigation. The letter in reply from the regional attorney, after summarizing the statutory background and quoting § 440.50, goes on to state:

"In order for services to be reimbursable as physicians' services within the meaning of this provision, the requirements of subsections (a) and (b) must be met. Therefore a service must be one within the State law definition of the scope of practice of medicine or osteopathy *and* provided by or under the personal supervision of a licensed medical or osteopathic physician. Reimbursement may not be withheld solely because an otherwise reimbursable service is provided under the personal supervision of a physician rather than by him or her directly. The State may, of course, decline to reimburse a service if it is not within State law definition of the scope of practice of medicine or osteopathy or if it is provided without

---

**10.** "FFP" means "Federal Financial Participation." It refers to the partial reimbursement for Medicaid expenditures available from the federal government to the states.

the actual personal supervision of a licensed physician. In addition, it is within the State's authority to set appropriate fees for reimbursement depending on the nature of the service rendered." (emphasis in original).

The regional attorney also attached copies of prior correspondence "for your further information." Among the correspondence attached were the two prior letters from which I have quoted. I am bound to say that, while I appreciate the assistance of HHS, the discussion most recently quoted can be read in more than one way. Indeed, counsel for all parties at oral argument professed to find support in various phrases of the letter; and a debate ensued as to the proper interpretation of the agency's interpretation. However, it is logical to conclude that by attaching copies of the agency's prior correspondence to its letter to the Court "for your further information," HHS intended to ratify and reaffirm the interpretations contained in those earlier letters. If that is a fair reading, then HHS persists in its contention that, by denying reimbursement to psychiatrists for the services of these ancillary personnel, the State defendants violate federal law and regulations.

That is the interpretation urged by the present plaintiff. In his submission, the State and County defendants are required by federal law to reimburse him, at the scheduled fee for his own services and for all services rendered, under his supervision, by his entire ancillary staff: social workers, psychologists, nurses, and other therapists.

#### (b) The State's Interpretation

The State defendants' interpretation focuses upon the requirement, in § 440.50, that "physician's services" be provided "within the scope of practice of medicine . . . as defined by State law." Defendants' argument is set forth in a letter dated January 15, 1979 addressed to Mr. O'Leary of HHS by David P. Glasel, Deputy Commissioner and General Counsel of the New York State Department of Social Services:

"It appears clear that a State *may* cover certified social workers under the Medical Assistance Program, and receive Federal reimbursement for payments for those services, where State law defines those services as within the scope of the practice of medicine. This statement is true whether the services are provided directly by a physician, or under his personal supervision.

"The operative part of this statement, however, is the phrase 'where State law defines those services as within the scope of the practice of medicine.' In my opinion, the services of a certified social worker are not, under the laws of New York State, within the scope of the practice of medicine. This opinion is universally shared by other officials of this Department, and has been expressed by the Department of Health.

"Furthermore, the question is one purely of State law and, therefore, of State interpretation. Under the concept of the Federal grant programs, Federal officials have no interest in interpreting State laws, and no authority to interpret State laws. In this particular instance, the scope of services covered as mandated 'physician services' under Federal law and regulations is left, by the same law and regulations, to the provisions of State law."

Commissioner Glasel concludes his letter to O'Leary with this defiant broadside:

"I therefore reaffirm the decision of this State that the services of a certified social worker are not within the scope of the practice of medicine in New York State, even though provided under the direction of a physician or psychiatrist; that those services cannot therefore be covered under the Medical Assistance program in this State; and that we intend to continue to deny claims for physician services that were in fact provided by certified social workers, and to recover any overpayments made on claims submitted in that circumstance, unless and until State law is changed."

The state has applied the same policy to ancillary personnel other than social workers, such as psychologists, therapists, or other counselors. The state has persisted in this policy, despite a reply from Mr. O'Leary's office that HHS was not persuaded by the state's arguments: hence, ultimately, this litigation.

Thus defendants' basic contention is that the services of a supervising physician's ancillary personnel are not reimbursable under § 440.50(a) unless the services *of the ancillary personnel* fall "within the scope of practice of medicine . . . as defined by State law." The nub of plaintiff's argument, apparently endorsed by HHS, is that it is sufficient if *only the supervising physician,* licensed under State law as required by subsection (b), renders services "within the scope of practice of medicine . . . as defined by State law." The ancillary personnel, on the face of this construction, could be literally anybody.

(c) *The State Statutes and Regulations*

To place these contentions in context, I turn to the New York State statutes and regulations cited by defendants.

Title VIII of the N.Y. State Education Law (McKinney 1972 & 1979–80 Supp.) is captioned "The Professions." Article 131 refers to "Medicine." Section 6521 provides:

"The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition."

Section 6522 provides:

"Only a person licensed or otherwise authorized under this article shall practice medicine or use the title 'physician'."

Section 6542(1) and (2) provide that, notwithstanding other provisions of law, a "physician's assistant" and a "specialist's assistant" may "perform medical services, but only under the supervision of a physician," and only when his acts and duties "are within the scope of practice of such supervising physician." Section 6541 of the Education Law provides for registration of

physician's assistants and specialist's assistants. The Commissioner of Public Health is empowered to promulgate regulations defining the assistants' duties, the degree of supervision required, and establishing medical specialties for which specialist's assistants may be registered under the Education Law. N.Y. Public Health Law §§ 3700, 3701 (McKinney 1977). Under present regulations, physician's assistants may be registered in the clinical fields of medicine, surgery, pediatrics, and obstetrics and gynecology; and specialist's assistants may be registered in orthopedics, urology, acupuncture, and radiology. 10 N.Y.C.R.R. §§ 94.1, 94.2.

Medicaid reimbursement to physicians in New York is governed by regulations promulgated by the Department of Social Services, 18 N.Y.C.R.R. §§ 505.1 *et seq.,* and the Department of Public Health, 10 N.Y.C.R.R. §§ 85.1 *et seq.* "Medical care and services available to eligible persons" includes "services of qualified physicians," 18 N.Y.C.R.R. § 505.1(1) who must be licensed or qualified as provided in § 505.2(1)(i) (general practitioners) and (ii) (specialists), psychiatry constituting one of the recognized specialties. 18 N.Y.C.R.R. § 505.15 deals particularly with psychiatric care. "Psychiatric care" may be provided by a "qualified psychiatrist" in his office; in the patient's home; in a clinic; or in hospitals. § 505.-15(a). "Psychiatric clinic care" may be provided "only in facilities or services which have been approved by the State Department of Mental Hygiene," § 505.15(b)(2)(i), and which consist of clinics situated in hospitals supervised by the State Department of Health pursuant to Article 28 of the Public Health Law; clinics operated by the State Department of Mental Hygiene; and clinics under contract with or operated by community mental health boards. § 505.-15(b)(2)(ii).

10 N.Y.C.R.R. §§ 85.28–85.31 govern Medicaid reimbursement of "outpatient psychiatric care." § 85.28(b) and (c) provide:

"(b) A private practicing physician is a physician who renders treatment to a pa-

tient on a fee-for-service basis and who is compensated for those services directly through the medical assistance for the needy program, except that payment for services may be made directly to a professional corporation or partnership in which the private practicing physician is a member or with which the private practicing physician is associated.

"(c) To be a covered benefit under medical assistance for the needy as provided in section 365–a.2 of the Social Services Law, outpatient psychiatric care rendered by a private practicing physician must be provided by a qualified psychiatrist in accordance with the requirements of sections 85.28 through 85.31 of this Part."

A new regulation, § 85.32, has been promulgated and, when fully implemented, will be effective retroactively to January 30, 1980. It provides:

"(a) Social work services may be provided by a social worker, practicing under the direct supervision of a qualified psychiatrist in private practice as part of a course of treatment provided by the supervising psychiatrist.

"(b) For purposes of this section, the term *social worker* shall mean a person authorized pursuant to the Education Law to use the title 'certified social worker'." (emphasis in original).

The regulation further provides that "a social worker may provide services only under the continuing direct supervision of a qualified psychiatrist," and that "the number of social workers supervised by the supervising psychiatrist shall not exceed four." The social worker's functions must be assigned "by the supervising psychiatrist, within the scope of practice of the supervising psychiatrist," § 85.32(c)(2). Payment for social work services are made to the supervising psychiatrist; state reimbursement is limited to the maximum reimbursable fees for social work, § 85.32(e)(1), (2). The new regulation is characterized as "cost effective, since such care is reimbursed at a substantially lower level than that provided directly by psychiatrists." [11] Companion amendments to 18 N.Y.C.R.R. § 505.15, also to become effective as of January 30, 1980, provide that in the delivery of psychiatric care, "a qualified psychiatrist in private practice may utilize the services of a certified social worker under his supervision as part of a course of treatment," § 505.15(a); a psychiatrist "may employ up to four certified social workers to provide care under his continuing direct supervision," § 505.-15(b)(1); state reimbursement will be based on fees established by the Department of Health, with payment for the social worker's services made to the supervising psychiatrist. § 505.15(b)(2)(i).

(d) *The Court's Analysis*

■ From these statutes and regulations emerge limitations upon the scope of the practice of medicine, as defined by New York State, and consequent limitations upon a private practitioner's right to reimbursement for services rendered to Medicaid-eligible patients. The decisive question on plaintiff's statutory claim is whether, notwithstanding those limitations, the state *must* reimburse plaintiff, at a psychiatrist's fee rate, for services rendered by a variety of ancillary personnel, excluded under present state law from the scope of the practice of medicine.

I answer that question in the negative. I could accept plaintiff's interpretation—and that of HHS, if the agency's letter to the Court of July 8, 1980 be read as an unqualified endorsement of its prior correspondence—only by disregarding the authority given to the states by the Social Security Act,[12] and by § 440.50 itself, to define the scope of medical practice within their borders.

Subsection (b) of § 440.50 unquestionably makes federal Medicaid funding available in respect of services rendered "by or under the personal supervision" of a licensed physician. It follows that the regulation con-

---

**11.** Affidavit of Donald W. Baehm, New York State Department of Health, at ¶ 8.

**12.** The states determine whether a physician is authorized to practice medicine. 42 U.S.C. § 1395x(r)(1).

templates reimbursement for the services of individuals other than a physician. Neither the Social Security Act nor the federal regulations specify who those individuals may be. The question therefore arises: are we confronted with a wide open field, or do limitations derive from state statutes and regulations? Plaintiff contends for the first of these propositions. It is implicit in his argument. The supervising psychiatrist has *carte blanche*. I put it to plaintiff's counsel during argument that, on plaintiff's interpretation, a supervising psychiatrist could employ witch doctors to administer therapy, and claim reimbursement for their services at the physician's rate. Counsel responded that state authorities had the power to investigate excessive witch doctoring in White Plains, and take remedial steps. But there is no reason why the onus should be on the state to conduct such investigations, and, under plaintiff's regulatory construction, considerable doubt exists as to the remedial steps that could be taken. If plaintiff's interpretation of § 440.50 is correct, the psychiatrist in private practice could demand reimbursement for the services of unlimited varieties of exotic therapists, whose methods may be highly suspect under generally accepted medical standards.

█ I do not suggest that Dr. Yapalater engages in such abuses, or entertains hopes of doing so. On the contrary, he appears to me from the evidence to be an experienced and dedicated physician. But the potential risk is real enough; and the state is entitled, under § 440.50(a), to require that services, to qualify for Medicaid reimbursement, be provided "within the scope of practice of medicine . . . as defined by State law." New York State has gone to considerable legislative and executive pains to define the scope of the practice of medicine. That scope is not strictly limited to physicians—*vide* the physician's assistants; specialist's assistants; and the certified social workers recently brought within the scope of the practice of psychiatry—but plaintiff's interpretation, which stresses the "under the personal supervision" phrase in § 440.50(b), would admit to the Medicaid-reimbursable scope of practice of medicine the

services of a host of individuals whom the state has deliberately excluded from its definition of that practice. That is a construction of subsection (b) which deprives subsection (a) of most of its practical meaning.

█ I appreciate that it is possible to read § 440.50 as plaintiff does; he argues that since he is a licensed physician, unquestionably practicing within the state's definition of the scope of medical practice, the regulation opens up an umbrella, under which all individuals employed and supervised by him cluster as providers of "physician's services." I must choose between that narrow reading of subsection (a)'s phrase "within the scope of practice of medicine . . . as defined by State law," and the more broad construction urged by defendants, which, while recognizing that the physician need not perform all services himself to be reimbursed, requires that his employees render services which the state recognizes as falling within the scope of the practice of medicine.

I prefer the latter construction because it constitutes a more balanced interaction between subsections (a) and (b); and because it gives more meaningful recognition to the state's interest in defining the practice of medicine within its borders. That state interest is rendered more significant, not less, by the fact that under Medicaid federal reimbursement is only partial, so that substantial state revenues are expended in funding the program.

The Court's construction runs counter to that of HHS, at least as expressed in its earlier correspondence with the state defendants. However, the agency's letter of July 8, 1980 to the Court, quoted *ante*, contains its own ambiguities; thus it is said: "The State may, *of course*, decline to reimburse a *service* if it is not within the State law definition of the scope of practice of medicine or osteopathy, *or* if it is provided without the actual personal supervision of a licensed physician." (emphasis added). Surely that sentence can be read to support the defendants' construction; and one senses, in the agency's response to an in-

quiry from the trial court in a litigated case, a possible retreat from the dogmatic tones with which HHS addressed the state agencies. Assuming, however, that HHS presses its interpretation with undiminished enthusiasm, I cannot accept it; and since the issue is one of "statutory reading and analysis," *Kurcsics, supra,* I may differ with the agency without overstepping the bounds of accepted judicial behavior.

Plaintiff's statutory claim is rejected.

## III.

*The Equal Protection Claim*

As previously noted, plaintiff's equal protection claim arises from the undisputed fact that the state allows Medicaid reimbursement to hospital and clinic providers of psychotherapeutic services which are performed by non-physician clinicians working under the supervision of licensed psychiatrists. Contending that he offers the identical services in substantially similar circumstances, Dr. Yapalater claims that the defendants' refusal to reimburse him for the very same treatment regimen creates an impermissible distinction between psychiatrists in private practice and psychiatrists employed in other settings.

By way of background, Dr. Yapalater testified that he structures his practice along the lines of the "typical mental health model." Dr. Yapalater explained that he has long believed in community-based outpatient treatment of both mild and severe mental illness. Accordingly, drawing on his exposure to clinics in the Westchester County area, Dr. Yapalater adopted a mental health team approach to the treatment of mental disorders, modeled after the clinics with which he had become familiar. Thus, Dr. Yapalater contends, his practice is structured in the very same way as public-sector mental health clinics are organized; given the identity of services and parallel structure, Dr. Yapalater argues, it is violative of the Equal Protection Clause of the fourteenth amendment to deny him Medicaid reimbursement while allowing such payment to these other providers.

The basic framework for analysis of such a claim is well-settled:

"We must decide, first, whether [state legislation] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If not, the [legislative] scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination . . . ." *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), *quoting San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).

Accord, *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312, 314, 96 S.Ct. 2562, 2566, 2567, 49 L.Ed.2d 520 (1976). Clearly, Dr. Yapalater does not fall within any of the limited categories of disadvantaged classes which require strict judicial scrutiny for purposes of equal protection analysis. Nor does the central question of this case involve a fundamental right explicitly or implicitly protected by the Constitution. Accordingly, plaintiff's equal protection claim requires examination of the state's policy of allowing reimbursement under the New York State Medical Assistance Program to community clinics and hospitals for services provided by non-physician therapists, while denying payment to psychiatrists in private practice for such services. I find that defendants have fulfilled their burden in establishing a legitimate purpose which is rationally related to and therefore justifies the distinction at issue.

In attempting to articulate the basis for differentiating between hospitals and clinics on the one hand, and private practitioners on the other, for purposes of Medicaid reimbursement of services performed by non-physicians, defendants point to several elements which are meant to distinguish the operation of public sector facilities from that of a physician in private practice, and which in their view amply justify the dis-

tinction at issue herein. Defendants rely upon the nature of the regulatory scheme under which the respective treatment settings operate; the structure of the reimbursement mechanism pursuant to which each seeks payment under the New York Medical Assistance program; and the scope of accepted medical practice in each of these delivery modes. Affidavit of Donald W. Baehm, sworn to June 20, 1980 ("Baehm Affidavit"), *passim.*

It cannot be disputed that hospitals and clinics are subject to a host of statutory and regulatory controls to a degree far beyond that applicable to private practitioners. The pertinent provisions of the statute and regulations under which public sector facilities exist need not be exhaustively recited in order to recognize that the state intrudes into virtually every facet of their operation. Hospitals, for instance, are subject to the strictures of Article 28 of the Public Health Law, which vests near-complete regulatory authority in the Department of Health. That agency has promulgated a maze of regulations affecting every significant medical, financial and organizational element of hospital operation. *See* Public Health Law § 2800 *et seq.* (McKinney 1977 and 1979–80 Supp.); 10 N.Y.C.R.R. § 400 *et seq.* Similarly, in order to be eligible for reimbursement for operating costs, clinics must operate under contract to local community services boards pursuant to an operating certificate authorizing the particular services for which payment is sought; such facilities are subject to joint regulation by the Office of Mental Health, the Office of Mental Retardation and Developmental Disabilities and the Office of Alcohol and Substance Abuse, which are component but autonomous parts of the New York State Department of Mental Hygiene. *See* Mental Hygiene Law § 5.01 *et seq.* (McKinney 1978 and 1979–80 Supp.). As in the case of the Department of Health's regulation of hospitals, the Department of Mental Hygiene prescribes comprehensive regulations governing virtually every aspect of the construction, operation and staffing of public mental health clinics. *See* 14 N.Y.C.R.R. § 1.1 *et seq.*

In comparison, privately practicing psychiatrists operate largely free of such comprehensive regulation, save for compliance with their individual licensure requirements as set forth in the New York State Education Law.

In general, defendants regard the reimbursement mechanisms as paralleling the foregoing operational controls in scope and complexity. Hospitals, it is conceded, are reimbursed under Medicaid according to their historical costs of operation, receiving reimbursement for in-patients based upon a daily rate and for out-patients based upon a per visit rate.

Clinics operating under contract are eligible for reimbursement of certain operating, maintenance and service costs. In addition, in-patient clinics receive reimbursement on an all-inclusive per diem basis, *see* 10 N.Y. C.R.R. § 100.2(k); out-patient psychiatric clinics operated by general hospitals receive reimbursement on a per visit basis according to rates established by the Department of Health for each particular hospital based on the facility's actual costs, 10 N.Y.C.R.R. § 100.2(m)(1); all other out-patient psychiatric clinics receive reimbursement on a fee-for-service basis under a fee schedule set forth in regulations promulgated by the Department of Mental Hygiene. 10 N.Y.C. R.R. § 100.2(m)(2).

Finally, reimbursement for treatment rendered by a psychiatrist in private practice is authorized by Section 365–a of the New York Social Service Law and is made according to a published medical fee schedule and is not based on an individual practitioner's costs.[13] Baehm Affidavit at ¶ 4.

---

**13.** Thus, the state's contention that the distinction under attack is justified upon the basis of differences in the manner in which reimbursement is calculated—historical cost versus fee-for-service—rests upon a flawed premise insofar as a subset of out-patient clinics receives payment on the same basis as private psychiatrists. Taken alone, then, the second element of differentiation defendants articulate fails as a matter of proof with respect to the limited category of clinic providers which operate under contract to community service or mental

In essence, defendants submit that these differences in the scope of regulation and the manner of calculating reimbursement reflect trends in the practice of psychiatry which have only recently begun to develop, trends which the state in the exercise of its informed discretion has recognized in the most recent amendments to the regulations governing reimbursement for social workers in the private setting.

More specifically, defendants contend that the reimbursement scheme is meant to parallel the generally recognized scope of practice in each provider category; accordingly, reimbursement to private practitioners for services rendered by non-physicians was not available because "in the past it was not a commonly accepted practice for private psychiatrists to employ social workers or other paraprofessionals as a component of treatment in a private setting." Baehm Affidavit, ¶ 7. Thus, until recently, "[n]o provision was made for reimbursement for psychiatric services [delivered in the private sector] provided by other than a qualified psychiatrist." *Id.* at ¶ 5.

However, in recognition of emerging trends in the practice of psychiatry and medicine generally,[14] the state has begun the process of aligning its reimbursement of private practitioners with that of other providers:

"More recently the evolution of new approaches in psychiatric care and an increased use generally of ancillary medical personnel led to a reevaluation of reimbursement regulations in this area. A determination was made that carefully controlled and delineated reimbursement for psychiatric care by certified social workers, working under the close supervision of a qualified psychiatrist would be appropriate and beneficial. Part 85 of the regulations was therefore amended by the addition of § 85.32, which provided for reimbursement for psychiatric social work provided by qualified social workers. Section 85.32 requires that such social workers be 'under the continuing direct supervision of a qualified psychiatrist' and limits to a maximum of four the number of social workers a single psychiatrist can supervise. It should also be noted that psychiatric care provided by social workers can be highly cost effective, since such care is reimbursed at a substantially lower level than that provided directly by psychiatrists.

"Section 85.32 carefully delineate[s] the psychiatric services that may be provided by social workers and the degree of supervision that must be provided by a psychiatrist. In addition, only care provided by qualified social workers is reimbursable under Medicaid. Other auxiliary or paraprofessionals are not covered under

health boards. It is true, of course, that payment to such providers is made to the clinic *qua* institution and not to the individual presumably *salaried* physician under whose supervision ancillary personnel may provide therapy, an element of difference not raised by defendants. These flaws aside, the other purposes to which defendants point as underlying the distinction at issue are sufficient to carry the day.

14. The legislature discussed the underlying needs and economic realities in its statement of legislative findings and purpose relating to the 1971 law providing for physician's and specialist's assistants:

"The existing shortage of physicians and other persons possession adequate qualifications for the provision of health services required by the people of this state constitutes a critical situation imperiling the public health. Many areas of the state lack adequate medical coverage due to the insufficient number

and uneven distribution of practicing physicians. The demand for physician services far exceeds the capability of the present number of physicians to supply them. Physical limitations on the number of patients a physician can personally attend make the use of persons qualified to assist the physician in the provision of medical care essential if such care is to be uniformly available to all of the people of the state.

"It is the purpose of this act [enacting this article and article 38 and article 131–A of the Education Law] to provide for the registration of physician's associates and specialist's assistants who will be available for employment by physicians to permit medical services to be given to persons not receiving them now and whose qualifications will assure that the health needs of patients are met properly." *McKinney* (1972), note following Public Health Law, § 3700.

§ 85.32. These carefully structured controls and restrictions are designed to prevent the creation of psychiatric service 'mills' where a small number of psychiatrists employ a large number of auxiliary personnel and develop a large practice based on the provision of low-grade psychiatric care by paraprofessionals with little or no meaningful supervision by a psychiatrist." Baehm Affidavit, ¶¶ 8–9.

It is perhaps fair to say that Dr. Yapalater is on the cutting edge of the generally recognized scope of psychiatry as practiced by individual physicians. Indeed, his efforts to graft modes of treatment employed in hospital and clinic settings onto his private practice may well be those of an innovative pioneer. But the question before me is whether the defendants' present position satisfies the applicable equal protection tests. The most recent amendments promulgated by the New York State Departments of Education and Health, which will permit private psychiatrists to secure reimbursement for services by social workers performing under their supervision, reflect the state's policy of incremental growth in the scope of Medicaid reimbursement, as the frontiers of the private practice of psychiatry expand. To find a violation of equal protection in these circumstances would require a conclusion that it is unreasonable to permit the state to proceed in this area in a gradual fashion, with such limits and controls as defendants consider necessary. No such conclusion is warranted on this record.

■■■■ That the present state of the law respecting reimbursement imposes some inequality between plaintiff and providers in other settings delivering comparable services does not compel a conclusion that Dr. Yapalater's constitutional rights have been infringed. *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The classification drawn into question herein must be sustained if it is rationally related to a legitimate governmental interest. *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

Thus, the interests protected by the Equal Protection Clause require only that the reimbursement scheme have some reasonable basis. *Massachusetts General Hospital v. Weiner*, 569 F.2d 1156, 1160–61 (1st Cir. 1978). The interests protected by the Equal Protection Clause are not implicated simply because the regulations do not act with mathematical nicety or because their impact results in some inequality between provider categories, *Massachusetts General, supra*, 569 F.2d at 1160–61; "[p]erfection in making the necessary classifications is neither possible nor necessary." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976).

■■■■ It is not the mission of the courts to decide whether the balance of competing interests reflected in the current reimbursement regulations is wise economic or social policy. *Cf. Harris v. McRae*, —— U.S. ——, ——, 100 S.Ct. 2671, 2693, 65 L.Ed.2d 784 (1980). The only requirement of equal protection is that the state's actions be rationally related to a legitimate governmental interest. The articulated purpose in recognizing for reimbursement purposes the expanding role of paraprofessionals in the private practice of psychiatry by means of regulatory controls, which furnish the necessary oversight to assure continued high-quality psychiatric care, constitutes a sufficient basis for sustaining the defendants' present regulations against equal protection attack. Nor is the state's interest in preventing the creation of psychiatric service "mills" entitled to any less weight because Dr. Yapalater himself may provide the highest quality care imaginable.

■■■■ If the New York Medical Assistance Plan's reimbursement to individual psychiatrists is underinclusive, in the sense that the use in private practice of paraprofessionals other than certified social workers is becoming generally accepted, this shortfall in the reimbursement mechanism does not rise to the level of a constitutional violation; "[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Ex-*

press Agency, Inc. v. New York, 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949). *See Vance v. Bradley*, 440 U.S. 93, 108–09, 99 S.Ct. 939, 948–949, 59 L.Ed.2d 171 (1979). The state is entitled to expand its reimbursement of the services at issue herein by means of the measured approach it has adopted. In the interim, the reimbursement classifications presently in force work no deprivation of Dr. Yapalater's interests in equal protection.

 The Equal Protection Clause might well be implicated if defendants reimbursed the services of ancillary personnel employed by certain psychiatrists in private practice, while denying it to others. But no such practice appears; on the contrary, the evidence indicates that the state's policy is applied uniformly to all psychiatrists in private practice. The state's gradual recognition of the role of ancillary personnel in the private practice of psychiatry is constitutionally permissible, representing as it does a rational approach to an adequately articulated public concern. No equal protection implications arise from the fact that, in the quite different contexts of hospitals and public mental health, clinics, the state is prepared to allow a broader based policy of reimbursement.[15]

## CONCLUSION

The Clerk of the Court is directed to enter judgment in favor of defendants, dismissing the complaint without costs.

In the exercise of my discretion, I direct that each party bear its own costs. While I have concluded that plaintiff's action must fail, it can hardly be regarded as frivolous, in view of the HHS correspondence upon which he relied.

It is So Ordered.

---

15. As noted, the complaint alleges in purely conclusory fashion a violation of plaintiff's right to due process. Plaintiff adduced no evidence on this claim at trial, nor was any reference made to a purported deprivation of due process in counsel's closing argument. Accordingly, the claim is deemed abandoned.